# Exhibit 1

## ENERGY MANAGEMENT AGREEMENT

This Energy Management Agreement ("Agreement") is made effective as of April 26 , 2017 ("Effective Date") by and between Viridity Energy Solutions Inc., a Delaware  company ("Energy Manager"), and Lone Star Demand Response LLC ("Customer"), sometimes hereinafter referred to collectively as the "Parties" and individually as a "Party."

### PRELIMINARY STATEMENT

WHEREAS, because certain Facilities (set forth on Exhibit A managed by Customer possess certain operational capabilities that may be consistent with certain aspects of the ERCOT electricity market pertaining to "Demand Response", Load Resource ("LR") and/or Emergency Response Service ("ERS"), Customer wishes to utilize the services of Energy Manager as its manager for  a Qualified Scheduling Entity in connection with Customer's desire to participate in opportunities that may arise in the ERCOT electricity market for Facilities that have Demand Response capabilities; and

WHEREAS, Energy Manager is in the business of participating in the ERCOT Market, and provides certain Energy Management Services of the sort described in this Agreement, via EDF Energy Services LLC, within ERCOT and in particular within the geographic region that is subject to the jurisdiction of ERCOT ; and

WHEREAS, because the Facilities are located within ERCOT and Customer has represented to Energy Manager that to the best of Customer's knowledge, the Facilities are eligible to participate in Demand Response related transactions, and Energy Manager has proposed to provide, subject to the terms and conditions set forth herein, certain Energy Management Services to Customer, or, if agreed to by Customer and Energy Manager in a Transaction Confirmation, to purchase Ancillary Services from Customer so as to enable Customer to participate in the ERCOT Demand Response Markets.

NOW THEREFORE, in consideration of the foregoing, the mutual agreements set forth herein and other good and valuable consideration for which the receipt and sufficiency is hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1   **Rules of Interpretation**.  Terms not otherwise defined herein shall have the meanings set forth in the ERCOT Nodal Protocols or ERCOT Operating Guides and include any substitute or replacement to such term.

1.2   **Definitions.**  The following terms when used herein shall have the meanings set forth below.

"Affiliate" means, with respect to any Party, any other person (other than an individual) that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party.  For purposes of the foregoing definition, "control" means the direct or indirect ownership of fifty percent (50%) or more of the outstanding capital stock or other equity interests having ordinary voting power.

"Agreement" means this Energy Management Agreement, together with all Transaction Confirmations, Transaction Notifications, exhibits, amendments and supplements hereto, all as the same may be amended or supplemented from time to time.

"Ancillary Services" means those services specified from time to time as "Ancillary Services" in the ERCOT Nodal Protocols and Operating Guides including  but not limited to Emergency Reserve Service (ERS), Responsive Reserve Service (RRS), Reg-Up and Reg-Down, and Fast Responsive Reserve Service (FRRS).

ERCOT EMA



"Annual Fee" has the meaning specified in Section 5.4.

"Applicable Laws" means any act, statute, law, regulation, permit, license, ordinance, rule, judgment, order, decree, directive, guideline, protocol or policy (to the extent mandatory) or any similar form of decision or determination by, or any interpretation or administration of, any of the foregoing by any government authority with jurisdiction over the Parties, the Facilities, or the Energy Management Services to be performed under this Agreement, including, but not limited to the ERCOT Nodal Protocols, and the ERCOT Operating Guides.

"Bankrupt" means with respect to any entity, such entity (i) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under a Bankrupt, Insolvent, reorganization or similar Applicable Laws, or has any such petition filed or commenced against it, (ii) makes an assignment or any general arrangement for the benefit of creditors, (iii) otherwise becomes Bankrupt or Insolvent (however evidenced), (iv) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (v) is generally unable to pay its debts as they fall due.

"Business Days" means any day except a Saturday, Sunday or other day on which commercial banks located in Houston, Texas are authorized or required to close.

"Capacity" means the Ancillary Service or Emergency Response Service "ERS" capacity of the Facilities, expressed in MW.

"Confidential Information" means any information exchanged between the Parties in furtherance of this Agreement, including the existence of this Agreement, the terms and conditions contained herein, any discussions undertaken by the Parties related to this Agreement or the opportunities that may arise in connection with the Agreement, and any Transaction or Transaction Confirmation undertaken by the Parties under the terms of this Agreement.

"Delivery Year" means a period commencing on and including June 1st of a calendar year and continuing through and including May 31st of the following calendar year.

"Defaulting Party" has the meaning given such term in Section 8.1.

"Effective Date" has the meaning specified in the introductory paragraph to this Agreement.

"Energy Management Agreement" means an agreement in form and substance mutually acceptable to Energy Manager and Customer pursuant to which Customer appoints Energy Manager as the provider of energy management services with respect to the Facility.

"Energy Manager" has the meaning specified in the introductory paragraph to this Agreement.

"ERCOT" means Electric Reliability Council of Texas, Inc.

"ERCOT Penalties" means the dollar amount of any penalties assessed by ERCOT or the Public Utility Commission of Texas as a direct result of (i) Customer's failure to supply certain Ancillary Services as set forth in a Market Award or to otherwise satisfy ERCOT rules

"ERCOT Nodal Protocols" means that certain Amended and Restated Nodal Protocols of ERCOT and approved by the PUCT, as may be amended, restated, supplemented or otherwise modified from time to time.

"ERCOT Operating Guides" means that certain Amended and Restated Operating Guides of ERCOT., as may be amended, restated, supplemented or otherwise modified from time to time.

"Event of Default" has the meaning specified in Section 8.1.

"Facility" has the meaning specified in the Recitals.

"Force Majeure" has the meaning given such term in Section 7.1.

"Good Electric Operating Practice" means the practices, methods and acts engaged in or approved by a significant portion of the electric power industry during the relevant time period, or the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result consistent with economic considerations, reliability, safety, expedition, and in accordance with the requirements of Governmental Authorities having jurisdiction; such term is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to constitute a spectrum of acceptable practices, methods or acts.

"Governmental Authority" means any federal, state, local, municipal or other government, any governmental, regulatory or administrative agency, commission or other authority lawfully exercising or entitled to exercise jurisdiction over the Parties or any transaction contemplated herein, including ERCOT and the PUCT.

"Gross Market Revenue" means revenue earned from ERCOT, or any other party, for the Parties participation in the Demand Response markets.

"HE" when used in connection with a reference to a time of Day, means "hour ending."

"LR" has the meaning given such term in the preamble.

"Market Award" means an award by ERCOT of an obligation to supply Ancillary Services to ERCOT as determined by ERCOT through ERCOT's operation and oversight of the Ancillary Services Market.

"Market Participant" has the meaning specified for such term in the ERCOT Operating Guides.

"Net Revenue" means the revenue for ERCOT DR programs after customer payments and agreed to costs.

"Party" and "Parties" have the respective meanings specified in the introductory paragraph to this Agreement.

"PUCT" means the Public Utility Commission of Texas.

"QSE" means a "Qualified Scheduling Entity" as that term is defined by the ERCOT Protocols.

"Taxes" means any and all sales, use, gross receipts, ad valorem, franchise, excise, or any other taxes or similar charges or impositions imposed by any Governmental Authority on, or with respect to any Transaction, product or service described in this Agreement, but specifically excluding income taxes imposed on a respective Party.

"Term" means the period of this Agreement as specified in Section 2.4.

"Transaction" means a purchase or sale of Ancillary Services.

"Transaction Confirmation" means a  written manifestation of the Party's intent to enter into a Transaction for the sale of Ancillary Services by Customer.

"Transaction Notification" means a notification substantially sent by Customer to Energy Manager requesting and authorizing Energy Manager to offer, settle, arrange, schedule or dispatch certain MW's, bid or offer prices and time period information into the Ancillary Services Market on behalf of Customer, provided that for a Transaction Notification to be valid, such Transaction Notification must be provided by Customer to Energy Manager prior to 9:00 a.m. CPT on the Business Day preceding the Day on which the Transaction that is the subject of the Transaction Notification is due to commence.

"Transfer of Responsibility" means the transfer from Energy Manager to another Market Participant of financial responsibility for obligations incurred by Energy Manager in connection with the performance of the Energy Management Services.

1.3     **Interpretation.** Except as otherwise expressly provided, the rules of interpretation and construction set forth below shall apply to this Agreement:

(i) all defined terms in the singular shall have the same meaning when used in the plural and vice versa;

(ii) the terms "hereof," "herein," "hereto" and similar words refer to this entire Agreement and not to any particular Article, Section, Exhibit or any other subdivision of this Agreement;

(iii) references to "Article", "Section" or "Exhibit" are to this Agreement unless specified otherwise;

(iv) references to any law, statute, rule, regulation, notification or statutory provision (including Applicable Laws) shall be construed as a reference to the same as it applies to this Agreement and may have been, or may from time to time be, amended, modified or re-enacted;

(v) references to "includes," "including" and similar phrases shall mean "including, without limitation";

(vi) the captions, Section numbers, Article numbers and headings in this Agreement are included for convenience of reference only and shall not in any way affect the meaning or interpretation of this Agreement; and

(vii) "or" may not be mutually exclusive, and can be construed to mean "and" where the context requires there to be a multiple rather than an alternative obligation.

Capitalized terms not defined herein shall have the meanings set forth in the ERCOT Operating Guides.

## ARTICLE II
## APPOINTMENT OF ENERGY MANAGER AND TERM

2.1     **Appointment of Energy Manager**. Customer hereby appoints and authorizes Energy Manager to perform the Energy Management Services as set forth herein, and Energy Manager hereby agrees to such appointment and authorization. Energy Manager shall perform the Energy Management Services, as more specifically described in Article 3 of this Agreement, or as requested by Customer in writing, and otherwise in strict conformity with this Agreement and the Standard of Care set forth in Section 2.2. The Parties acknowledge and agree that Energy Manager shall be an independent contractor and as such shall not be an agent for or on behalf of Customer. Therefore Energy Manager has no authority to act as agent for or on behalf of Customer with regard to any other contract or in any other manner not authorized herein, without the express prior written consent of Customer. Customer will select an Authorized Representative(s) who shall be authorized, subject to any necessary approvals, to act for and on behalf of Customer on all matters concerning this Agreement. The Parties have designated the individuals in Exhibit B to act as Energy Manager and Authorized Representatives and shall promptly notify each other in writing of any replacements thereof.

2.2     **Standard of Care**. Energy Manager shall perform Energy Management Services for Customer in accordance with (i) Applicable Laws, and, to the extent not inconsistent with Applicable Laws, (ii) this Agreement, (iii) ERCOT Nodal Protocols, (iv) ERCOT Operating Guides (v) FERC Protocols, (vi) Good Electric Operating Practices and (vii) Customer instructions and clarifications provided to Energy Manager pursuant to Section 3. Energy Manager shall use good faith efforts to minimize any additional costs to Customer related to over-scheduling or over-committing that may be provided by the Facilities. Energy Manager cannot and does not

ERCOT EMA

guarantee any particular level of performance or success with respect to the results that Customer may expect to attain under this Agreement or with respect to any Transaction undertaken hereunder pursuant to a Transaction Notification, or with respect to any opportunity that may present itself with respect to the Facilities or otherwise.  Under no circumstances shall Energy Manager owe Customer any fiduciary or similar standard of care under this Agreement or with respect to the performance of the Energy Management Services.  Further, Customer acknowledges that Energy Manager performs services similar to the Energy Management Services on behalf of third parties aside from Customer and executes transactions similar to those that may be executed under this Agreement for Energy Manager's own account and for the account of third parties.  Nothing contained in this Agreement shall be construed to require Energy Manager to favor the interests of Customer over its own interests or the interests of any third party, it being understood that Energy Manager shall use reasonable efforts to provide the Energy Management Services set forth in this Agreement consistent with reasonably prudent practice taking into account the relevant market conditions that Energy Manager and ultimately Customer may determine from time to time.

2.3     **Compliance with Laws**.  Energy Manager and Customer shall at all times comply with all Applicable Laws. Nothing contained in this Agreement shall be construed to require Energy Manager to take any action on behalf of Customer or otherwise that Energy Manager determines may be contrary to Applicable Laws.

2.4     **Term**.  (a) The term of this Agreement shall commence  on April 30, 2017 and shall expire , on December 30 2019, unless terminated earlier as otherwise provided.

(b) Renewal. Upon expiration of the Initial Term, this Agreement shall automatically renew for additional one-year term[s] unless either Party provides written notice of nonrenewal at least  90 days prior to the end of the then-current term (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), or unless sooner terminated as provided herein. If the Term is renewed for any Renewal Term[s] pursuant to this Section, the terms and conditions of this Agreement during each such Renewal Term shall be the same as the terms and conditions in effect immediately prior to such renewal. If either Party provides timely notice of its intent not to renew this Agreement, then, unless otherwise sooner terminated in accordance with its terms, this Agreement shall terminate on the expiration of the then-current Term.

## ARTICLE III
## ENERGY MANAGEMENT SERVICES

3.1     Subject to any additional terms and conditions set forth in a Transaction Notification, the Energy Management Services to be performed by Energy Manager shall include the services and undertakings set forth in this Article 3.  A detailed listing of Energy Manager and Customer responsibilities is set forth on Exhibit C.

3.2     Energy Manager shall, on behalf of Customer:

(a)     Act as Energy Manager for Customer's Facilities.  Energy Manager's obligation to provide energy management services shall however only extend to the functions necessary to permit Customer and Customer's Facilities to participate in the ERCOT Demand Response and Ancillary Service Market opportunities identified and agreed to by Customer in accordance with this Agreement.  Energy Manager's obligation to provide energy management services shall be limited to: Load Acting as a Resource (LaaR, Responsive Reserve Service (RRS) and Emergency Reserve Service (ERS).

(b)     Offer Ancillary Services from the Facilities for sale into the ERCOT Market in accordance with this Agreement and any directives of Customer set forth in a Transaction Notification.

(c)     Arrange for the Facilities to provide Demand Response, including the monitoring and coordination, as necessary, of the dispatch of Customer's Facilities, in accordance with the Transaction Notification, and any Market Awards, all in a manner consistent with the capability of the Facilities and the ERCOT Operating Guides.

ERCOT EMA

(d)   Serve as Primary Contact for scheduling and energy trading counterparties on a 24-hour, 7-day-a-week basis.

(e)   Relay and transmit to Customer all ERCOT deployment messages and notices concerning the physical operation or physical performance of the Facility verbally (via phone call) and e-mail and text  and through XML file.

(f)   Coordinate, with Customer, all testing required by ERCOT for Ancillary Services and ERS.

(g)   As directed by Customer, schedule outages with ERCOT.

(h)   Provide backup Ancillary Services under the following circumstances. When Customer has agreed, pursuant to a Transaction Notification, to supply certain Ancillary Services, and Customer, for whatever reason including but not limited to Force Majeure, fails to deliver any such Ancillary Service, Energy Manager, will be required by ERCOT to procure and provide replacement Ancillary Services.  Under such circumstances, Energy Manager will (i) attempt in every such instance to secure the replacement Ancillary Services at competitive market prices, or (ii) elect not to offer Customer's Ancillary Services Capacity for sale until such time as the delivery of the Ancillary Service Capacity can be resumed based on Energy Manager's reasonable determination as to ability of Customer to resume delivery, provided however that Energy Manager shall verbally consult with Customer before making such election. Customer and Energy Manager expressly agree that Customer will bear the actual cost of any such replacement Ancillary Services that Customer fails to deliver, including replacement cost procured by ERCOT.

3.3   Energy Manager shall have no liability under any other contracts entered into by Customer in accordance with the terms of this Agreement.  Nothing contained herein shall be deemed to make Energy Manager a party or a third-party beneficiary under any such contracts.  For disputes or other issues arising under these contracts or any other contracts entered into by or on behalf of Customer under this Agreement, the provisions of those contracts shall speak for themselves and Customer shall look solely to the counterparty to the underlying contract at issue in order to resolve any such disputes or other issues.

3.4   In the performance of the Energy Management Services, Energy Manager shall have no authority to operate the Facilities, it being understood that the Customer shall be solely responsible for operating the Facilities and causing the Facilities to provide Demand Response Services or the other products and services required under this Agreement, unless specifically set forth in a Transaction Confirmation.  Nevertheless, in addition to the other indemnification obligations set forth in this Agreement, Customer shall defend, indemnify and hold harmless Energy Manager and its Affiliates from and against any and all Claims that may arise, and any liability, claim, penalty or other damages that may be incurred by Energy Manager as a result of Customer's failure to cause the Facilities to respond to a Market Award, to operate in the manner required by the ERCOT Nodal Protocols or under Applicable Laws whether in response to a Market Award or otherwise, provided that Customer's failure to respond is not a result of Energy Manager's failure to provide to Customer timely instructions for Customer's required response.  Any such amounts due and owing as a result of any such failure of the Facilities to respond to a Market Award, shall be paid by Customer to Energy Manager upon demand. Notwithstanding the first sentence of this Section, if an end-user wishes to have its Facilities controlled by Energy Manager's Network Operations Center, such service shall be available.

3.5   Energy Manager shall submit any and all filings necessary to allow Energy Manager to perform the Energy Management Services hereunder in accordance with the Standards of Care set forth in Section 2.2.

**ARTICLE IV**
**CUSTOMER DUTIES AND RESPONSIBILITIES**

ERCOT EMA

4.1   Customer shall timely provide Energy Manager with access to information as reasonably necessary for Energy Manager to perform its obligations under this Agreement.  Customer represents and warrants that to the Facilities are eligible to participate in the ERCOT Energy and Ancillary Service markets and in the manner contemplated by the ERCOT Operating Guides.  Customer further covenants to use commercially reasonable efforts to obtain and maintain all permits, authorizations, approvals, necessary for Customer or for the Facilities to comply with the obligations set forth in this Agreement, and to ensure that the Facilities can respond to a Market Award as required by this Agreement.  Customer has performed or will perform all tests and other performance metrics as may be reasonably required to assure that the Facilities remain in compliance with the foregoing throughout the term of this Agreement.

4.2   Customer will determine the capabilities necessary for the Ancillary Service offers and communicate them to Energy Manager.

4.3   Customer shall comply with requirements to maintain the ability to respond to dispatch signals from ERCOT and/or Energy Manager in connection with any Transaction or Market Award hereunder.  If Customer and Energy Manager have agreed upon, bid and/or scheduled a Transaction or Market Award, Customer shall operate its Facilities in a commercially reasonable manner and in conformity with the terms and conditions of any such Transaction or Market Award.  In the event Customer's Facilities are routinely operated such that they do not or cannot comply with such arrangement or instructions, Customer's failure to follow such agreement or instructions violates any ERCOT directive and/or FERC Protocol, Energy Manager shall have the right to suspend  services under this Agreement at Energy Manager's discretion until such time as Energy Manager determines that Customer's Facilities can again meet the performance requirements set forth in this Agreement and the performance requirements of the ERCOT Operating Guides provided that Energy Manager verbally consults with Customer before suspending services.

4.4   Customer shall at its sole cost and expense install, own and maintain equipment at the Facilities  sufficient to monitor deliveries of electrical energy to and from the Facilities, and for the transmission of real-time operational information from the Facilities to Energy Manager.  All costs, fees and expenses that are pre-approved by Customer in writing and that are actually incurred by Energy Manager in connection with the execution and performance of the Energy Management Services pursuant to a Transaction Notification, (but not a Transaction Confirmation) shall be for the account of Customer.

4.5   Customer shall make all filings, file such reports, affidavits, and notices or other materials required by the ERCOT Nodal Protocols and Operating Guides,  FERC Protocols and Applicable Laws that are necessary to comply with the terms of this Agreement.  Customer shall provide to Energy Manager all information reasonably requested by Energy Manager which is required by ERCOT Protocols, Government Authorities, or which is otherwise necessary for Energy Manager to provide the services set forth in this Energy Management Agreement.

## ARTICLE V
## COMPENSATION and CASH FLOWS

5.1    **Energy Management Fee.** Customer shall pay Energy Manager annual fees as set forth below for QSE and dispatch services:

**MW's of Operational DR during Transition Period**. Transition period is defined as the Customer DR portfolio being less than 100MW's or 1 year of operations, whichever occurs first. During the transition period. Energy Manager will deduct the fees detailed below from ERCOT payments to Energy Manager for Customer's DR portfolio before distributing any funds to Customer.

1-25 MW of ERS and/or RRS – 80% of Net Revenue or $80,000 per annum, whichever is less.
26-50 MW of ERS and/or RRS – 70% of Net Revenue or $90,000 per annum, whichever is less
51-100 MW of ERS and/or RRS – 60% of Net Revenue or $100,000 per annum, whichever is less

MW's of Operational DR post Transition Period
   1-99 MW of ERS and RRS    - $105,00  per annum
   100-199 MW of ERS and RRS   - $120,000 per annum plus 10% of Net Revenue
   200-299 MW of ERS and RRS   - $150,000 per annum plus 10% of Net Revenue
   300+ MW of ERS and RRS $240,000 per annum plus 10% of Net Revenue

Financial Settlement and Payment of Fees. Within fifteen days after Energy Manager receives funds from ERCOT for Demand Response Services, Energy Manager shall provide to Customer a statement (a "Statement"), which will set forth the revenue earned by Customer and Energy Manager shall transmit said revenue to Customer by wire transfer. The Fee set forth in Section 5.1 shall be withheld from such transmittal. Statements will be sent by Energy Manager via email or facsimile to the email address or facsimile number, as applicable, set forth below. The monthly fee (annual fee divided by 12) shall be based on **Peak MW enrolled to ERS and RRS** for the month. The Peak MW enrolled to ERS and RRS shall be provided monthly.

| Customer: | Lone Star Demand Response, LLC |
|---|---|
| Address: | 1079 West Round Grove Road, Suite 300-260, Lewisville, Texas 75067 |
| Facsimile: | 972-382-9930 |
| Email: | keith@lonestardemandresponse.com |

5.2    **Termination Fee**. In the event that this Agreement is terminated for any reason other than the occurrence of an Event of Default on the part of Energy Manager, Customer shall pay to Energy Manager a termination fee (the "Termination Fee") in an amount equal to the unpaid portion of the Fee set forth in Section 5.1. In the event that this Agreement is terminated for any reason other than the occurrence of an Event of Default on the part of Customer, Energy Manager shall pay to Customer a termination fee (the "Termination Fee") in an amount equal to the ERCOT revenue due to Customer.

## ARTICLE VI
## NOTICES

6.1    **Notices**. Notices required or permitted to be given under this Agreement will be in writing and deemed to be properly given if: (a) delivered in person, (b) sent by facsimile with confirmation, (c) sent by email with confirmation, (d) deposited in the United States certified mail with first class postage prepaid, or (e) delivered by private, prepaid courier, and addressed to the appropriate Party; provided, however, that notices of interruption and communications to transmitting utility(ies) may be provided verbally, effective immediately

ERCOT EMA

and, upon request, confirmed in writing.  Notices delivered in person, by facsimile or by email will be deemed to have been received by the close of the Business Day on which it was delivered (unless transmitted or hand delivered after 5:00 P.M. local time, in which case it will be deemed received on the next Business Day). Notices by mail or courier will be deemed to have been received two (2) Business Days after it was sent.  A Party may change its address by providing written notice to the other Party by letter properly addressed.  The addresses of the Parties are as follows on Exhibit B.

## ARTICLE VII
## FORCE MAJEURE

7.1   **Force Majeure**.  "<u>Force Majeure</u>" shall mean an event that is beyond the reasonable control of the Claiming Party and that could not have been prevented by the exercise of due diligence, including, but not limited to: acts of God; civil disturbances or disobedience; labor dispute, labor shortage; sabotage; explosions; accidents affecting Party's machinery and other facilities; lightning; earthquakes; fires; storms; tornadoes, floods, failure of transmission or distribution or the ERCOT; acts of a public enemy; acts of terrorism; the direct or indirect effect of governmental orders, actions or interferences. Nothing contained herein shall be construed to require a Claiming Party to settle any strike or labor dispute.  If either Party is rendered unable by Force Majeure to carry out, in whole or part, its obligations under this Agreement, such Party shall give notice and provide full details of the event to the other Party in writing as soon as practicable after the occurrence of the event.  During any period in which there exists an event of Force Majeure, the obligations of the Parties (other than the obligation to make payments when due or becoming due with respect to performance prior to the event) will be suspended to the extent required.  The Party claiming Force Majeure will make all reasonable attempts to remedy the effects of the Force Majeure and continue performance under this Agreement with all reasonable dispatch. Force Majeure shall not include: (a) Customer's decision to permanently shut down, sell or relocate its Facilities, or (b) economic loss due to Customer's loss of markets or suppliers.

## ARTICLE VIII
## DEFAULT AND REMEDIES

8.1   **Events of Default.**   An "<u>Event of Default</u>" shall mean, with respect to a Party (a "<u>Defaulting Party</u>"), the occurrence of any of the following: (a) failure by a Party to make, when due, any undisputed payment required under this Agreement and such failure is not remedied within five (5) Days after receipt of written notice thereof;  (b) any representation or warranty made by a Party proves to be false or misleading in any material respect when made the effects of which could reasonably be expected to materially adversely affect the Non-Defaulting Party provided such misrepresentation or false statement shall not constitute an Event of Default if such condition or circumstance is (i) subject to cure and (ii) remedied within thirty (30) Days after written notice of such default from the Non-Defaulting Party; (c) the failure by a Party to perform any material obligation set forth in the Agreement which is not excused by Force Majeure or cured within thirty (30) Days after written notice thereof; or (d) a Party (i) makes an assignment or any general arrangement for the benefit of creditors; (ii) files a petition or otherwise commences, authorizes or acquiesces to the commencement of a proceeding or cause of action with respect to it under any bankruptcy proceeding or similar Applicable Laws for the protection of creditors, or has such petition filed against it and such petition is not withdrawn or dismissed within twenty (20) Business Days after such filing; or (iii) otherwise becomes Insolvent (however evidenced); or (iv) is unable to pay its debts as they fall due; (e)  two (2) failures within one calendar year by Energy Manager to timely perform Energy Management Services set forth herein in accordance with ERCOT protocols.

8.2   **Remedies Upon an Event of Default or Early Termination.**  If there exists an Event of Default, then the Non-Defaulting Party may, in its discretion, terminate this Agreement and pursue all remedies available under Applicable Laws.   Notwithstanding the foregoing, should Customer default in its obligations under this Agreement, Energy Manager may  suspend performance upon thirty days notice to Customer and take such steps

as may be necessary in Energy Manager's judgment to discontinue its status as the QSE of record for Customer. Upon any termination of this Agreement, Energy Manager agrees to execute, file and submit such documentation as may be required by ERCOT to terminate Energy Manager's QSE representation of Customer and to allow Customer to appoint a new QSE.

8.3     **Mitigation.**   In addition to any other rights and remedies that may be available to Energy Manager, if Energy Manager terminates this Agreement pursuant to Section 8.2, Energy Manager may take commercially reasonable actions in order to mitigate or otherwise avoid any potential costs, expenses, penalties, fines, charges and other liabilities of every kind and character, including reasonable fees of attorneys ("Losses") that it may incur to a third party as a result of or in connection with any failure to satisfy any Capacity Obligations with respect to the Facility.

8.4     <u>Transfer of Responsibility</u>.   At the **<u>written</u>** request of Customer either upon the termination of this Agreement pursuant to this <u>Section 8.1</u> or at any time during the Term, Energy Manager will take such actions as Customer may reasonably request to cause the Transfer of Responsibility with respect to the Facilities.  Customer shall promptly reimburse Energy Manager for reasonable out-of-pocket costs and expenses incurred by Energy Manager in connection with such Transfer of Responsibility.  This <u>Section 8.4</u> survives the termination of this Agreement.

## ARTICLE IX
### TAXES

9.1     **Taxes**.  Customer shall be responsible for all Taxes arising out of or with respect to the transactions evidenced by this Agreement, including but not limited to those associated with the Energy Management Services, any Market Award, and any Transactions undertaken pursuant to this Agreement, but excluding all Taxes levied on Energy Manager's income, net income, and all franchise taxes levied on Energy Manager's corporate existence and corporate right to transact business and taxes levied on Energy Manager's real and personal property.  The Parties will each use reasonable efforts to implement the provisions of this Agreement in accordance with their intent to minimize Taxes, so long as neither Party is materially adversely affected by such efforts.  Either Party, upon written request of the other, will provide a certificate of exemption or other reasonably satisfactory evidence of exemption if that Party is exempt from Taxes.  In the event that Customer is due a tax refund in connection with any transaction due to Energy Manager's failure to timely recognize valid exemption documentation, Customer consents to have the overpaid tax credited by Energy Manager to Customer's account.  Customer has the responsibility to petition the taxing authority for all other Tax refunds applicable to Customer.  Each Party hereby agrees to indemnify, release, defend and hold the other Party harmless from and against any and all liabilities for Taxes imposed or assessed by any taxing authority with respect to any services provided for herein that are the responsibility of such Party pursuant to the terms of this Agreement.  Neither Party will be obligated to incur any financial burden to reduce Taxes for which the other Party is responsible.

## ARTICLE X
### INDEMNIFICATION

10.1    **Limitation of Liability. THE LIABILITY OF THE DEFAULTING PARTY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY AND ALL OTHER DAMAGES AND REMEDIES ARE WAIVED.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES IN TORT, CONTRACT UNDER ANY INDEMNITY PROVISION OR OTHERWISE.**

10.2    **<u>CUSTOMER'S INDEMNIFICATION OF ENERGY MANAGER.</u>**     SUBJECT       TO       THE LIMITATIONS SET FORTH IN <u>SECTION 10.1</u> ABOVE AND EXCEPT TO THE EXTENT RESULTING FROM (I) ENERGY MANAGER'S BREACH OF THIS AGREEMENT OR ANY TRANSACTION CONFIRMATION EXECUTED BY ENERGY MANAGER PURSUANT TO THIS AGREEMENT, (II) THE

ERCOT EMA

NEGLIGENCE OF ENERGY MANAGER, OR (III) ANY ACTIONS OF ENERGY MANAGER OUTSIDE THE COURSE AND SCOPE OF ITS AUTHORITY HEREUNDER, CUSTOMER SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS ENERGY MANAGER FROM, AGAINST AND IN RESPECT OF ANY AND ALL THIRD PARTY CLAIMS AGAINST ENERGY MANAGER TO THE EXTENT ARISING  FROM OR RELATED TO ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS MADE IN THIS AGREEMENT BY CUSTOMER.  IN ADDITION CUSTOMER SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS ENERGY MANAGER FROM, AGAINST AND IN RESPECT OF ANY AND ALL THIRD PARTY CLAIMS AGAINST ENERGY MANAGER TO THE EXTENT ARISING  FROM OR RELATED TO ANY ACTION BY ENERGY MANAGER TO CLOSE AN END-USER CIRCUIT.

10.3 **ENERGY MANAGER'S INDEMNIFICATION OF CUSTOMER.**   SUBJECT   TO   THE LIMITATIONS SET FORTH IN <u>SECTION 10.1</u> ABOVE AND EXCEPT TO THE EXTENT RESULTING FROM CUSTOMER'S BREACH OF THIS AGREEMENT, ENERGY MANAGER SHALL DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS CUSTOMER FROM, AGAINST AND IN RESPECT OF ANY AND ALL CLAIMS AGAINST  CUSTOMER TO THE EXTENT ARISING FROM OR RELATED TO (I) ANY BREACH OF ANY OF THE REPRESENTATIONS, WARRANTIES, COVENANTS OR AGREEMENTS MADE IN THIS AGREEMENT OR ANY TRANSACTION CONFIRMATION EXECUTED BY ENERGY MANAGER, OR (II) ANY ACTIONS OF ENERGY MANAGER OUTSIDE THE COURSE AND SCOPE OF ITS AUTHORITY HEREUNDER OR (III) an EVENT OF DEFAULT PURSUANT TO SECTION 8.1(e).

THE FOREGOING INDEMNITIES CONTAINED IN <u>SECTIONS 10.2</u> AND <u>10.3</u> SHALL SURVIVE TERMINATION OF THIS AGREEMENT FOR THE APPLICABLE STATUTE OF LIMITATIONS PERIOD.

10.4 **Maximum Liability of Energy Manager.** Without limiting the generality of Section 10.1, the total aggregate liability of Energy Manager for any losses or damages under this Agreement is limited to the Fees paid pursuant to Section 5.1.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES

11.1 **Representations and Warranties.**  As a material inducement to entering into this Agreement, and in addition to the other presentations and warranties set forth in this Agreement, each Party, with respect to itself, represents and warrants to the other Party as of the Effective Date of the Agreement as follows: (a) it is duly organized, validly existing and in good standing under the Applicable Laws of the jurisdiction of its formation and is qualified to conduct its business in those jurisdictions necessary to perform this Agreement; (b) it has all regulatory authorizations, permits and licenses necessary under Applicable Laws for it to legally perform its obligations under this Agreement; (c) the execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms or conditions in its governing documents or any contract to which it is a party or any Applicable Laws pertaining to such Party; (d) this Agreement and each other document executed and delivered in accordance with this Agreement constitutes its legally valid and binding obligation enforceable against it in accordance with its terms, subject to any equitable defenses; (e) it is not Bankrupt or Insolvent and there are no reorganization, receivership or other arrangement proceedings pending or being contemplated by it, or to its knowledge, threatened against it; (f) there are no suits, proceedings, judgments, rulings or orders by or before any court or any Governmental Authority that materially adversely affect its ability to perform this Agreement; and (g) it has read this Agreement and fully understands its rights and obligations under this Agreement.

11.2 With the exception of any warranty that is expressly set forth in this Agreement, both parties and their Affiliates, successors, assigns and delegates make NO WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE with regard to the services provided hereunder, or the activities a party may undertake pursuant to this Agreement.

**ARTICLE XII**
**MISCELLANEOUS**

12.1 **Confidentiality**. Neither Party shall disclose, unless authorized in writing by the other Party, the terms of this Agreement, including the fees paid, to a third party (other than the Party's lenders, counselors or accountants who have an obligation to keep such terms confidential) except in order to comply with any Applicable Laws or to obtain transmission, distribution, ancillary or other regulated services; provided, each Party will notify the other Party of any proceeding of which it is aware of that may result in non-routine disclosure. This confidentiality provision shall not apply to (a) information that was known to a Party prior to obtaining information from the other Party, (b) information in the public domain, (c) information obtained by a Party from a third party who did not, directly or indirectly, receive the information from the other Party to this Agreement or from an entity who was under an obligation of confidentiality to the other Party to this Agreement or (d) information developed by either Party independent of any Confidential Information. The Parties shall be entitled to all remedies available at law or in equity to enforce, or seek in connection with, this confidentiality obligation; provided, all monetary damages shall be limited to direct actual damages and a breach of this Section shall not give rise to a right to suspend or terminate this Agreement.

12.2 **Change in Applicable Laws.** In the event that there is a change in Applicable Laws, and such change affects the collection of authorized CSPs in ERCOT providing Energy Management Services to Load Resource in ERCOT generally, and such change in Applicable Laws causes or results in Energy Manager incurring increased capital, operating or other costs in connection with the commitments undertaken with Customer under this Agreement, and provided that the total aggregate, economic impact associated with such change excess of Twenty Five Thousand Dollars ($25,000), then Energy Manager may require that Customer meet as soon as practicable to attempt to renegotiate the Agreement to comply with such change or to overcome the economic affects of such change in Applicable Laws; provided, that, in the event such a change in Applicable Laws renders performance under this Agreement illegal, the Parties shall meet as soon as practicable to attempt to renegotiate the Agreement to comply with such change. If the Parties are unable to reach agreement as to an appropriate amendment to this Agreement as provided above, the Parties' obligations hereunder shall terminate upon the earlier of the date the change in Applicable Laws becomes effective or on the date Customer commences service with another provider of Energy Management Services in lieu of Energy Manager.

12.3 **Governing Law**. INCLUDING ANY COUNTERCLAIMS AND CROSS CLAIMS ASSERTED IN SUCH ACTION, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF TEXAS, WITHOUT REGARD TO THE LAWS OF TEXAS REQUIRING THE APPLICATION OF THE LAWS OF ANOTHER STATE.

12.4 **Non-Waiver.** No waiver by any Party hereto of any one (1) or more defaults by the other Party in the performance of any of the provisions of this Agreement will be construed as a waiver of any other default or defaults, whether of a like kind or different nature.

12.5 **Severability**. Any provision or Article or Section declared or rendered unlawful by a court of law or regulatory agency with jurisdiction over the Parties, or deemed unlawful because of a statutory change, will not otherwise affect the lawful obligations that arise under this Agreement.

12.6 **Survival.** All indemnity and audit rights will survive the termination of this Agreement for the periods set forth herein. All obligations provided in this Agreement will remain in effect for the purpose of complying herewith.

12.7 **Counterparts.** This Agreement may be executed in several counterparts, each of which will be an original and all of which constitute one and the same Agreement. The delivery of an executed counterpart to this Agreement by electronic means shall for all purposes be effective as the delivery of an originally executed counterpart.

ERCOT EMA

12.8   **Third Party Beneficiaries**.  The provisions of this Agreement are for the benefit of the Parties and their respective parent corporations and subsidiaries or Affiliates (if any) and not for any other person or third party beneficiary.  The provisions of this Agreement shall not impart rights enforceable by any person, firm or organization other than a Party, or a successor or assignee of a Party to this Agreement.

12.9   **Assignment**.  Neither Party shall assign this Agreement or any of its rights and obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. This Agreement shall be binding upon and shall inure to the benefit of, and may be performed by, the successors and assigns of the Parties.  No consent shall be required in connection with any assignment or disposition of this Agreement if such assignment or disposition is incident to a merger or consolidation with, or transfer of all, or substantially all, of the assets of the transferor to another person or entity that shall assume all of the obligations of the assignor under this Agreement and demonstrate financial capacity at least equal to that of the assignor.

12.10  **Remedies Cumulative**.  Except as expressly provided otherwise in this Agreement, all remedies in this Agreement, including the right of termination, are cumulative, and use of any remedy shall not preclude any other remedy in this Agreement.

12.11  **Relationship of Parties**.  Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust or partnership covenant, obligation, or liability on or with regard to the Parties.  Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement.

12.12  **Other Agreements**.  No provision of this Agreement shall preclude any Party from entering into other agreements or conducting transactions under existing agreements with the other Party (that is, Energy Manager and Customer) or third parties (that is, any entity other than Energy Manager and Customer).  This Agreement shall not be deemed to modify or change any rights or obligations under any prior contracts or agreements between the Parties.

12.13  **Audit Rights**. Energy Manager shall maintain all books and records, including supporting documentation, of all activities, costs, and expenditures incurred pursuant to this Agreement in such detail that they may be readily computed, audited, and copied by Customer. Such records shall be available for inspection and audit by Customer's Authorized Representative at reasonable times and places throughout the term of this Agreement and for two (2) years after final payment.  If any such examination reveals any inaccuracy in any statement, invoice, charge or computation, the necessary adjustments to such statement, invoice, charge or computation will be promptly made and the payments thereof or reimbursement therefor will also be promptly made and shall bear interest at the lesser of (a) one and one-half percent (1½ %) per Month and (b) the maximum rate permitted by Applicable Laws, from the date the overpayment or underpayment was made until paid.

12.14  **Performance Assurance**:  If either Party determines in its reasonable discretion that the other Party's creditworthiness or ability to perform under this Agreement has become unsatisfactory due to a material adverse change in the financial conditions of the other Party then that Party (hereafter and for the purposes of Paragraph 12.14 of this Agreement (the "Requesting Party") may require Performance Assurance. The Requesting Party shall provide the other Party (hereafter and for the purposes of Paragraph 12.14 of this Agreement (the "Receiving Party") with written notice requesting such Performance Assurance in an amount determined by the Requesting Party in a commercially reasonable manner. Upon receipt of such notice the Receiving Party shall have three (3) days to provide such Performance Assurance to the Requesting Party. In the event that the Receiving Party fails to provide such Performance Assurance within  ten (10) days of receipt of such notice, then an Event of Default shall be deemed to have occurred and the Requesting Party shall be entitled to exercise any remedies set forth in this Agreement. Performance Assurance shall mean cash, letter(s) of credit, corporate guarantees, or other security each in form and amount reasonably acceptable to the Requesting Party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties, by their respective duly authorized representatives, have executed this Agreement effective as of the Effective Date.  This Agreement will not become effective as to either Party unless and until executed by both Parties.

**VIRIDITY ENERGY SOLUTIONS, INC.**                    **LONE STAR DEMAND RESPONSE LLC**


**By:**                                               **By:**



**Name:**   Rajan Chudgar                              **Name:**   _Keith_M._Vauquelin
            Ofer Halat

**Title:**   President                                 **Title:**   President
             VP of Finance


*[Signature Page to Energy Management Agreement]*

**Exhibit A**

**Facilities**

| [NAME] | [ADDRESS] | [ESI ID] |
|--------|-----------|----------|

**Exhibit B**
**Energy Manager/Authorized Representatives**

**LONE STAR DEMAND RESPONSE, LLC:**

Keith M. Vauquelin
President, Founder
Office: 972-877-1691
Cell: 972-877-1691
Email: keith@lonestardemandresponse.com

**Viridity Energy Authorized Representatives:**
Mike Pavo
General Manager
Office: 267.507.9041
Cell: 410.629.9692
Email: mpavo@viridityenergy.com

## Exhibit C

## Responsibility Matrix – Demand Response for Lone Star DR (LSDR) Originated Load

| Item | Lone Star Responsibilities | Viridity Energy Responsibilities | Joint Responsibilities |
|------|----------------------------|----------------------------------|------------------------|
| 1 | Prospect and find new Customers | Complete ERID, RARF and other ERCOT forms | Develop Standard operating Plans (SOP) for customers |
| 2 | Ensure "no end runs" on Viridity Energy | Coordinate SCADA integration with ERCOT for new customers | Reviewing customer data to determine bid levels |
| 3 | Execute new Customer DR agreements on Lone Star DR / Viridity Energy Approved DR agreement forms | Create and maintain communications system for Customer notifications during events | Any ERCOT required certifications or test qualifications of customer sites or equipment |
| 4 | Collect ALL information necessary to get new DR customer enrolled in LR or ERS | Performing communications tests with customers | Regulatory filings |
| 5 | For initial entry into ERCOT market, supply all information in support of registration process to ERCOT | Event notifications to Customers | |
| 6 | Coordinate with Viridity Energy DR Operations | Compiling ERCOT reports on awards | |
| 7 | Coordinate all field - to - Viridity Energy testing at Customer sites | Compiling ERCOT reports on event performance and availability results | |
| 8 | Support ANY and ALL abnormalities which may occur in pre-qualification and qualified ERCOT LR activities | Compiling customer level financial reports from ERCOT | |
| 9 | Responsible for contacting ERS customers for each period 60 days before entry into the ERS market to determine willingness to participate in next ERS period, and update all event notification information | Bidding and scheduling with ERCOT | |
| 10 | Responsible for contacting LR customers to update event notification contact lists and procedures | 7x24 Monitoring of RRS customer site load | |
| 11 | Responsible for adjusted gross revenue disbursement to LSDR customers and partners after Viridity Energy retains their service fees | Notification to Lone Star and Customer of any site equipment failures or issues | |
| 12 | Advises Viridity Energy of any LR or ERS customers outage with respect to: a)24 hours before the day of outage notification to Viridity Energy of an LR outage b)5 consecutive calendar days of before outage notification to Viridity Energy of an ERS outage c)Inform customer via DR | | |

| | | | | |
|---|---|---|---|---|
| | agreement and training they are responsible for all costs associated with late notification of an outage, and/or replacement costs for an unplanned outage | | | |
| 13 | Marketing materials or Welcoming instructions to customers | | | |
| 14 | Customer contact to repair communications equipment | | | |

NOTES:

1.  "DLC" = Direct Load Control - customer has onsite command / control / data acquisition for curtailment of his load from VE Dispatch

2.  "ILC" = Indirect Load Control - customer and QSE uses existing Energy Management System to curtail load based on signals received from VE QSE

3.  "MLC" = Manual Load Control - customer curtails load on event notification via phone call, e-mail, and text message from VE QSE

<u>INDEMNIFICATION AGREEMENT</u>

WHEREAS Lone Star Demand Response, LLC ("Lonestar") and Viridity Energy Solutions Inc. ("Viridity") are parties to an Energy Management Agreement dated April 26, 2017; and

WHEREAS Lonestar and Energen Resources Corporation ("Energen") have requested that Viridity provide the service of remote closure of electric breakers for ERCOT DEMAND RESPONSE RRS participation only following an RRS test or event, and whereas Viridity has agreed to provide said service under the conditions set forth below,

It Is Therefore Agreed that:

ABSENT LONESTAR AND/OR VIRIDITY'S GROSS NEGLIGENCE OR WILFUL MISCONDUCT, ENERGEN AGREES TO INDEMNIFY, DEFEND, SAVE AND HOLD HARMLESS VIRIDITY AND LONE STAR, AND THEIR RESPECTIVE SHARE HOLDERS, OFFICERS, DIRECTORS, PRINCIPALS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUBSIDIARIES, AFFILIATES, SUCCESSORS, ADMINISTRATORS AND ASSIGNS AND ALL OTHER PERSONS, FIRMS AND CORPORATIONS  OF AND FROM ANY AND ALL DAMAGES, EXPENSE, COSTS, FINES, PENALTIES OR FEES AND INCLUDING ALL INJURIES AND DAMAGES, KNOWN AND UNKNOWN, BOTH TO PERSON AND PROPERTY, TANGIBLE AND INTANGIBLE, DEATH OR LOSS OF SERVICES, PROPERTY DAMAGES, COSTS, DAMAGES OF ALL OTHER KINDS, REASONABLE ATTORNEYS FEES, SUBROGATED INTEREST, EXPENSES AND COMPENSATION OF ANY NATURE WHATSOEVER, INCURRED BY VIRIDITY AND LONE STAR, OR ADJUDGED AGAINST VIRIDITY AND LONE STAR, AS THE RESULT OF ANY CLAIMS, ACTIONS, CAUSES OF ACTION, DAMAGES, OR FEES SOUGHT OR BROUGHT BY ANY PERSONS OR ENTITIES NOT PARTIES TO THIS AGREEMENT AGAINST VIRIDITY AND LONE STAR ARISING DIRECTLY OUT OF THE OCCURRENCE OF THE SERVICES PROVIDED TO ENERGEN HEREUNDER.

**Lone Star Demand Response, LLC**

Name:   Keith M. Vauquelin

Title:    President, Founder

Date:    June 28, 2017

**Viridity Energy Solutions Inc.**

Name: Rajan Chudgar

Title: President

Date: 7/5/2017

**Energen Resources Corporation**

Name: Joe D. Niederhofer

Title:   Vice President – Permian Basin Operations

Date: 7/5/17

<u>Amendment No. 2 to Energy Management Agreement</u>

WHEREAS Lone Star Demand Response, LLC (Lone Star) and Viridity Energy Solutions Inc. (Virdity) are parties to an Energy Management Agreement (Agreement) dated April 26, 2017; and

WHEREAS Lone Star and Viridity have agreed that Viridity shall provide the additional service of marketing, on a bilateral basis, excess Lone Star curtailment capacity that does not clear an ERCOT RRS auction (the 'Service');

It is therefore agreed that the Energy Management Agreement is amended by adding the following:

Lone Star authorizes Virdity to offer excess curtailment capacity of LoneStar customers that does not clear an ERCOT RRS auction to available buyers.  Revenue derived from any such transactions shall be distributed 50%/50% between Lone Star and Viridity until Viridity's annual fees set forth in Section 5.1 of the Agreement are paid, after which 100% to Lone Star, subject to the 10% of net revenue payable to Viridity per Section 5.1 of the Agreement.

**Lone Star Demand Response, LLC**                    Viridity Energy Solutions Inc.

_____                    _____

Name:  **Keith M. Vauquelin**                                  Name: **Mack E. Treece**

Title:     **President**                                                    Title: _____**CEO**_____

Date:     **January 19, 2018**                                      Date: _____**2/4/2018**_____


                                                                               _____

                                                                               Name: _____

                                                                               Title: _____

                                                                               Date: _____

## Amendment No. 4 to Energy Management Agreement

WHEREAS Lone Star Demand Response, LLC (Lone Star) and Viridity Energy Solutions Inc. (Virdity) are parties to an Energy Management Agreement (Agreement) dated April 26, 2017 and to Amendments 1-3 to the Agreement; and

WHEREAS Lone Star and Viridity have agreed that Viridity shall provide additional services to Lone Star;

It is therefore agreed that the Agreement and Amendments 1-3 remain in full force and effect and that the following additional provisions apply as well:

1.        Virdity shall provide the following services upon the terms stated:

- **VPower Load Monitoring Licenses**: Viridity shall provide licenses for its VPower Load Monitoring service for a fee $1,500 per year/ per meter, based on the "go-live" date of August 9, 2017 in VPower.  The Parties agree that Lone Star shall pay Viridity $30,000 for the 20 licenses provided previously and that another $30,000 charge will be due when the currently existing licenses come up for renewal on August 9, 2018. Each year on August 9th Viridity will apply the annual license fee of $1,500 times the number of current active meters in VPower as that date.

- **Viridity shall charge Lone Star an Hourly Rate** for general consulting, settlements, metering, and help desk assistance including for contracts, legal language, wholesale and customer settlements, of $150 /hour.

- **Bilateral Transactions Collateral Fee**: Amendment # 2 sets forth terms under which Viridity will provide the additional service of marketing and managing, on a bilateral basis, agreed to Lone Star curtailment capacity. The Parties agree that for each such transaction Lone Star shall pay a fee (in addition to that set forth in Amendment #2) related to the collateral requirements associated with such transactions.  The fee shall be calculated on an individual transaction basis and provided to Lone Star for approval.

- **Payments-** Each of the payments owed to Viridity pursuant to this Amendment shall be deducted from the monthly payments owed to Lone Star and shall be detailed on the monthly settlement statements as appropriate.

- Cont'd for signature:

- 2. The Term of the Agreement is hereby extended to December 31, 2020.

IN WITNESS WHEREOF, the Parties have signed this Agreement by their authorized representatives.

Viridity Energy Solutions, Inc.

By: _____

Name: Rajan ChacGn

Title: President

Date: 08/28/2018

Lone Star Demand Response LLC

By: _____

Name: Keith M. Vauquelin

Title:  President

Date:  08-28-18

Viridity Energy Solutions, Inc.

By: _____

Name: Ofer Haiat

Title:  VP of Fianace

Date:  09/01/2018

**COMPREHENSIVE AMENDMENT to ENERGY MANAGEMENT AGREEMENT AND AMENDMENTS.**

WHEREAS Viridity Energy Solutions Inc. (VESI) and Lone Star Demand Response LLC (Lone Star) are parties to an  Energy Management Agreement dated April 26, 2017, Indemnification Agreement dated July 5, 2017, Amendment No. 2 dated February 4, 2018, Amendment No. 3 dated May 14, 2018, Amendment No. 4 dated September 1, 2018, Cancellation Agreement dated September 19, 2019 (cancelling Amendment No.3); and;

WHEREAS VESI and Lone Star wish to extend the Terms and amend the Energy Management Agreement dated April 26, 2017, Indemnification Agreement dated July 5, 2017, Amendment No. 2 dated February 4, 2018 , and  Amendment No. 4 dated September 1, 2018.

IT IS THEREFORE, this 26th day of June, 2020 Agreed:

1. The Term of the Energy Management Agreement dated April 26, 2017, Indemnification Agreement dated July 5, 2017, Amendment No. 2 dated February 4, 2018, and Amendment No. 4 dated September 1, 2018, are all extended to December 31, 2025.

2. The Energy Management Agreement is amended by adding the following as new section 5.11:

   **5.11 Onboarding Fee**: Lone Star shall also pay an onboarding fee of $1,750 for each site  on-boarded by VESI, in addition to the passthrough of costs from EDF. This fee shall be effective on and after the last date set forth in the signature blocks herein and shall apply only to sites on-boarded after said date.

3. Section 1 of Amendment No. 4 is amended by deleting the following:

   "Each year on August 9th Viridity will apply the annual license fee of $1500 times the number of current active meters in VPower at that date."

      And replacing it with:

         "Viridity shall bill the license fee monthly at $125 per month per site."

4. Amendment No. 4 is amended by adding new Section 1.1 as follows:

   **5.11 True-Up Payment:**  Lone Star shall pay a sum total of $16,900 for sites which have been on-boarded since August 2019 but for which the annual license fee has not yet been paid.  This total shall be paid in the following manner: Viridity shall withhold $2816.67 each month, for a total of 6 equal payments, from July thru December 2020 from payments otherwise due to Lone Star in these months as the means by which to receive the True up payment.

5.  Section 5.1 of the Energy Management Agreement is amended as follows:

    "300+ MW of ERS and RRS $240,000 per annum plus 10% of Net Revenue" is deleted

    And is replaced by:

    "300-399 MW of ERS and RRS $240,000 per annum plus 10% of Net Revenue" and

    "400+ MW of ERS and RRS $340,000 per annum plus 10% of Net Revenue".

6.  The Energy Management Fees set forth in Section 5.1 of the Energy Management Agreement shall increase in January of each year starting in January 2022 by 4%.

Viridity Energy Solutions Inc.                    Lone Star Demand Response LLC.

By:_____                        By:_____

Name:_____ofer haiat_____                       Name: Keith M. Vauquelin

Title:_____CFO_____                       Title: President, Owner

Date:___06/30/2020_____                      Date: 06-30-20

Shimon Hatzir
General Manager